Lourdes HOUGHTALING,
et al., Plaintiffs,

v.

UNISYS CORP., successor to Burroughs
Corp., Defendant.

Civil Action No. 94–2344 (JCL).

United States District Court,
D. New Jersey.

Aug. 7, 1996.

Arnold Carl Lakind, Szaferman, Lakind, Blumstein, Watter & Bladder, Lawrenceville, NJ, for Plaintiffs.

Steven P. Benenson, Porzio, Bromberg & Newman, Morristown, NJ, for Defendant.

## OPINION

LIFLAND, District Judge.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332. Lourdes Houghtaling alleges that her hands were in-

jured in the course of her employment with the United States Postal Service (the "Postal Service") by the repetitive use of a Multi–Positional Letter Sorting Machine ("MPLSM") manufactured by Unisys Corporation.[1] She and her husband, John, assert claims based on products liability and negligence, contending that the MPLSM keyboard design is defective and that Unisys failed to warn of the defect. Unisys now moves for summary judgment, arguing that its tort liability under New Jersey law is preempted by the government contractor defense as set forth by the Supreme Court in *Boyle v. United Technologies Corp.*, 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988). For the following reasons, the Court will grant Unisys' motion and dismiss Houghtaling's complaint in its entirety.

### Background

The following facts are not in dispute. Between 1987 and 1993, Lourdes Houghtaling used an MPLSM in the course of her employment with the Postal Service. The MPLSM is a large letter-sorting machine that consists of twelve operator stations. The machine sends about 60 letters per minute past each station, where a worker reads ZIP codes and enters them on two ten-key, piano-style keyboards arranged in two tiers. Based on the ZIP code information entered by the operator, the MPLSM directs each letter to an appropriate sort bin.

In 1958, the Postal Service awarded Unisys a contract to build ten prototypes of the MPLSM. The sorting machine prototypes were first used in post offices in 1959. In 1964, the Postal Service awarded Unisys the first MPLSM production contract to manufacture 26 machines. Under subsequent contracts over the next two decades, Unisys manufactured over 900 MPLSMs for the Postal Service. The MPLSM design was modified in the early 1970s to allow the machine to use ZIP code information to sort mail, and again in 1980 to accommodate nine-digit ZIP codes.

The earliest written specifications for the MPLSM contained in the record are from 1970. *See* Def.'s Ex. 1. These specifications include provisions concerning the operator console, the keyboard, the key pressure adjustment control, the operator chair, and safety devices. *See id* at ¶¶ 3.10.1, 3.10.1.6, 3.10.1.6.1, 3.10.1.10, 3.11.7.12. The specifications also require that the MPLSM conform to Postal Service master drawings. *See id* at ¶ 2.4. The Postal Service awarded Unisys contracts in the 1970s and 1980s to produce MPLSMs conforming to its design specifications, and approved and accepted the MPLSMs manufactured under these contracts.

Since the MPLSM was first developed, the Postal Service has undertaken studies of the "human factors" of MPLSM operation, including issues relating to efficiency and ease of use of the keyboard. *See* Def.'s Ex. 28 (1976 annotated bibliography of Postal Service human factors reports). In 1970, the United Federation of Postal Clerks submitted an agenda for a meeting with representatives of the Postal Service which noted that "[i]n some cases [MPLSM] operators have developed, after years of operating, an arthritic condition in their wrists attributable to sustained suspension of their hands above the keyboard." Def.'s Ex. 22. In 1976, the National Institute for Occupational Safety and Health ("NIOSH") commissioned a study of hand, wrist, and arm problems suffered by MPLSM operators. See Def.'s Ex. 33. Postal Service officials testified before Congress in 1984 about Carpal Tunnel Syndrome suffered by MPLSM operators. *See* Def.'s Ex. 30.

### Standard for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure directs a district court to grant summary judgment:

if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

---

1. Defendant Unisys is the successor-in-interest to Burroughs and Sperry Corporations, which merged in 1987. While only the actions of Burroughs Corporation are relevant to this case, defendant will be referred to as Unisys throughout this opinion.

The burden of showing that no genuine issue of material fact exists rests initially with the moving party. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). If the moving party shows that there is an absence of evidence to support the non-moving party's case, the burden shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 323–325, 106 S.Ct. at 2552–2554; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The non-moving party may establish that the case presents a genuine issue for trial by showing that there is sufficient evidence favoring the non-moving party to enable a reasonable fact finder to return a verdict in that party's favor. *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510–11. In evaluating a motion for summary judgment, the court must view the facts, and the reasonable inferences therefrom, in the light most favorable to the non-moving party. *Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir.1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977).

### Government Contractor Defense

Unisys argues that it is entitled to summary judgment based on the government contractor defense, as set forth by the Supreme Court in *Boyle v. United Technologies Corp.,* 487 U.S. at 511, 108 S.Ct. at 2518. The *Boyle* Court reasoned that state tort law should not govern discretionary decisions involved in federal procurement. Therefore, the Court ruled that state tort law is preempted as a matter of federal common law where its demands conflict with those placed on contractors by the federal government. *Id.* The Court held that a government contractor is exempt from state tort liability where (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to it but not to the United States. *Id.* at 512, 108 S.Ct. at 2518–19. The Third Circuit has held that the government contractor defense is available to nonmilitary contractors. *Carley v. Wheeled Coach,* 991 F.2d 1117, 1123 (3d Cir.), *cert. denied,* 510 U.S. 868, 114 S.Ct. 191, 126 L.Ed.2d 150 (1993).

Unisys contends that Houghtaling's design defect and failure to warn claims are preempted under the government contractor defense, and that it therefore is not liable for any injury that Houghtaling may have sustained through MPLSM use. In particular, Unisys argues that (1) the Postal Service issued comprehensive "build-to-print" design specifications for the sorting machines, including operator consoles, keyboards, and safety features, (2) the Unisys sorting machines conformed to the reasonably precise specifications issued by the government, and (3) it knew of no danger associated with the use of the MPLSM keyboard which was not known to the Postal Service. Unisys also contends that because it was not at liberty to attach warnings to the sorting machines, the government contractor defense also preempts Houghtaling's failure to warn claim.

Houghtaling opposes Unisys' summary judgment motion on three bases. She argues that (1) the relevant specifications were not "reasonably precise" so as to shield Unisys from liability; (2) Unisys has failed to demonstrate that the Postal Service had knowledge of the dangers inherent in use of the sorting machines; and (3) no specification prohibited Unisys from including a warning with its letter sorting machines.

The record before this Court is essentially the same as that in three recently decided cases in this district. *See Pierce v. Unisys Corp.,* Civ. No. 94–2343 (D.N.J. July 12, 1996); *Crespo v. Unisys Corp.,* Civ. No. 94–2339 (D.N.J. June 21, 1996); *Russek v. Unisys Corp.,* 921 F.Supp. 1277 (D.N.J.1996). The plaintiffs in all three cases were also Postal Service employees who asserted design defect and failure to warn claims against Unisys based on hand injuries that they allegedly suffered from MPLSM use. In each case, the court found that the undisputed facts supported application of the government contractor defense and granted defendant's motion for summary judgment on all claims.

### Precision of the Relevant Specifications

The Third Circuit has stated that, with respect to the first part of the *Boyle* test, "the government need not deprive the manufacturer of all discretion pertaining to a particular design feature in order for the government contractor defense to apply." *Carley*, 991 F.2d at 1125. Therefore, it is not necessary, as Houghtaling contends, for the Postal Service specifications to directly conflict with the duty imposed by state tort law. As the *Russek* court noted, the failure of the MPLSM specifications "to specifically negate every possible ergonomic modification to the design does not change that status [of being reasonably precise]." *Russek*, 921 F.Supp. at 1288; *see also, Crespo* at 25 (holding that to require a showing that MPLSM specifications prohibited Unisys from using an alternative keyboard design before the government contractor defense applies is to "read the word 'reasonably' out of the 'reasonably precise specifications' element of the *Boyle* test.")

■ The Court finds that the 1970 MPLSM specifications-which included provisions concerning the operator console, the keyboard, the key pressure adjustment control, the operator chair, and safety devices, and referred to Postal Service master drawings-are "reasonably precise." Unisys presents uncontradicted evidence that, with regard to keyboard design, similarly precise specifications applied to all MPLSMs manufactured in the 1970s and 1980s. *See* Stotler Aff., ¶ 3, A (Def.'s Ex. 10); Okun Aff., ¶ 5, A (Def.'s Ex. 8).

Furthermore, Unisys presents evidence that the MPLSM was originally "engineered to meet rigid postal specifications." Def.'s Ex. 6 at 2 (October 13, 1959).[2] Houghtaling

has pointed to nothing in the record that contradicts Unisys' evidence that the Postal Service approved reasonably precise specifications for MPLSMs manufactured before and after 1970, but rather relies on her argument that the Postal Service specifications did not preclude Unisys from meeting the duty that state tort law imposed on its design of the MPLSM keyboard.[3] However, that argument is not relevant to the government contractor defense. Therefore, the Court finds that the Postal Service approved reasonably precise specifications for all MPLSMs produced by Unisys. Unisys has satisfied the first part of the government contractor defense.

### Unisys' Conformance to Postal Service Specifications

■ In order to satisfy the second prong of the government contractor defense, Unisys must show that it produced MPLSMs in conformance with the reasonably precise Postal Service specifications. Unisys presents evidence which shows that Postal Service inspectors examined the first MPLSM manufactured under the original 1964 production contract to ensure that it conformed to specifications. Okun Aff., ¶ 8. Government inspectors also examined MPLSM parts and subassemblies produced by Unisys under the 1964 contract and all subsequent production contracts and noted where they did not conform with the drawings. *See id.* at ¶ 7; Vogel Aff., ¶ 6 (Def.'s Ex. 2). Unisys then corrected any discrepancies and resubmitted the MPLSM part for inspection. *See* Okun Aff., ¶ 8. Furthermore, a Postal Service representative was usually present during MPLSM assembly and installation in a post office. *See* Vogel Aff., ¶ 8. After installation, a "live mail" test of the MPLSM was conducted for an eight-hour shift to verify that

---

**2.** Uncontradicted affidavits establish that Unisys obtained design drawings-including those for the keyboard design-and specifications-to build the MPLSMs under its 1958 prototype contract with the Postal Service and that any deviations from the MPLSM design by Unisys could only be directed by the Postal Service. Lieske Aff., ¶ 4 (Def.'s Ex. 4). In 1963 or 1964, the Postal Service developed a comprehensive set of detailed production drawings and specifications for the MPLSM, including ones for the keyboard. *Id.* at ¶ 7. Unisys' first MPLSM production contract, awarded in 1964, incorporated these "build-to-

print" drawings and specifications, as did subsequent MPLSM production contracts. *Id.* at ¶ 9; France Aff., ¶ 5 (Def.'s Ex. 8).

**3.** Houghtaling also argues that application of the best evidence rule precludes the Court from considering any affidavit testimony with regard to the MPLSM specifications. However, Fed. R.Civ.P. 56(c) specifically directs the Court to examine affidavits on a summary judgment motion.

the MPLSM conformed to Postal Service specifications. *See id.* If deficiencies were discovered during the live mail test, Unisys made adjustments to the MPLSM, and a second test was conducted. *See id.* at ¶ 9. At an exit conference following the completion of the live mail test, a representative of the Postal Service certified that the MPLSM had been tested and that it conformed in all material respects to the specifications. *See id.*

Houghtaling offers nothing to contradict Unisys' evidence that the MPLSMs which it manufactured conformed to Postal Service specifications. Therefore, on the undisputed facts, the Court finds that the MPLSMs manufactured by Unisys conformed to Postal Service specifications. Unisys has met the second requirement of the government contractor defense.

### Relative States of Knowledge of the Postal Service and Unisys

██ In order to satisfy the third prong of the government contractor defense, Unisys must show that it warned the Postal Service about dangers associated with MPLSM use which were known to it but not to the Postal Service. Unisys presents evidence showing that, in 1970, the United Federation of Postal Clerks notified the Postal Service about hand, wrist, and arm problems experienced by MPLSM operators. *See* Def.'s Ex. 22. Furthermore, in 1976, NIOSH began a study of hand, wrist, and arm problems suffered by MPLSM operators, which was completed in 1981. *See* Def.'s Ex. 33. Finally, Postal Service officials testified at Congressional hearings in 1984 regarding repetitive stress injuries suffered by MPLSM operators. *See* Def.'s Ex. 30. Nothing presented by Houghtaling contradicts this showing that the Postal Service was well aware of the risks inherent in MPLSM use.

Furthermore, Unisys presents affidavit evidence which shows that several of its managerial employees involved in MPLSM production since 1964 were unaware of hazards associated with the MPLSM keyboard design. *See* Vogel Aff., ¶ 14; France Aff., ¶ 7; Okun Aff., ¶ 13; Ross Aff., ¶ 7; Stotler Aff., ¶ 10; Selin Aff., ¶ 8; Clarke Aff., ¶ 13; Picus Aff., ¶ 7; Tartar Aff., ¶ 10; Lazzarotti Aff.,

¶ 18 (Def.'s Exs. 2, 7–15). In response, Houghtaling argues that the earliest study linking Carpal Tunnel Syndrome with specific design defects in the MPLSM keyboard appeared in 1984. *See* Def.'s Ex. 35. Furthermore, she argues that there is no evidence that the Postal Service was aware of this study or earlier studies of Carpal Tunnel Syndrome in MPLSM operators. Finally, Houghtaling contends that a 1983 paper about wrist and lower arm problems associated with traditional keyboards written by Michael Campion, a Unisys employee, shows that Unisys had knowledge of MPLSM keyboard design defects. *See* Lakind Aff., ¶ 11, Tab G.

Even assuming that the Campion study, which does not mention MPLSMs, establishes that Unisys was aware of the risks associated with its MPLSM keyboard design in 1983, Houghtaling presents no evidence to counter Unisys' evidence that the Postal service was aware of these risks well before that date. Nor does Houghtaling present any evidence that Unisys knew of dangers associated with MPLSM use before 1983. Therefore, the Court finds that Unisys did not fail to warn the Postal Service about dangers associated with MPLSM use which were known to it but not to the Postal Service. *See Crespo* at 34 (similar record supports conclusion that Unisys did not fail to disclose risks associated with MPLSM keyboard design that were known to it but not to the Postal Service); *Russek,* 921 F.Supp. at 1291 (Unisys meets third part of *Boyle* test and is entitled to summary judgment). Having satisfied all three prongs of the government contractor defense, Unisys is entitled to summary judgment with regard to Houghtaling's design defect claims.

### Failure to Warn Claim

The Third Circuit has not yet confronted the application of the government contractor defense to failure to warn claims. Houghtaling urges the Court to adopt the view taken by the Second, Ninth, and Eleventh Circuits, which have held that the government contractor defense does not preempt a failure to warn claim unless the specifications at issue affirmatively prohibit warnings or contain specific warning requirements that signifi-

cantly conflict with those required by state law. *See In re Hawaii Fed. Asbestos Cases,* 960 F.2d 806, 812–813 (9th Cir.1992); *In re Joint E. and S. Dist. New York Asbestos Litig.,* 897 F.2d 626, 630 (2d Cir.1990); *Dorse v. Eagle–Picher Indus., Inc.,* 898 F.2d 1487, 1489 (11th Cir.1990).

Other courts in this district have refused to use this standard. *See Crespo* at 36; *Pierce* at 4; *Russek,* 921 F.Supp. at 1292–93. The Court finds the reasons set forth by the court in *Crespo* for rejecting this standard to be persuasive. There, the court explained that adopting this standard would "increase transaction costs by encouraging contractors to obtain contractual language from the government prohibiting them from providing any warnings not specifically required in the specifications." *Crespo* at 36. Furthermore, "[i]f the contractors could not negotiate such a clause, the increased costs of their assuming the risk of adverse tort judgments would also be passed on to the government." *Id.* Either result would undermine the rationale of *Boyle. See Boyle,* 487 U.S. at 507, 108 S.Ct. at 2515–16 ("The imposition of liability on Government contractors will directly affect the terms of Government contracts: either the contractor will decline to manufacture the design specified by the Government, or it will raise its price. Either way, the interests of the United States will be directly affected.")

Courts have also analyzed the problem in two other ways. Unisys argues that the Court should apply the standard adopted by the Sixth Circuit in *Tate v. Boeing Helicopters,* 55 F.3d 1150 (6th Cir.1995). However, the Court need not choose between this analysis, utilized in *Crespo,* and that employed in *Russek* and *Pierce,* as both produce the same result.

The *Tate* court held that the government contractor defense applies to failure to warn claims where:

> (1) the United States exercised its discretion and approved the warnings, if any; (2) the contractor provided warnings that conformed to the approved warnings; and (3) the contractor warned the United States of the dangers in the equipment's use about

which the contractor knew, but the United States did not.

*Id.* at 1157.

Taking yet another approach, the *Russek* court held that because a failure to warn may be considered a design defect in a product, if a defendant establishes a government contractor defense for a design defect claim, then the concomitant failure to warn claim is also preempted. *Russek,* 921 F.Supp. at 1293. The court gleaned this standard from a line of Fifth Circuit cases which rejected failure to warn claims where design defect claims were precluded by the government contractor defense. *See Bailey v. McDonnell Douglas Corp.,* 989 F.2d 794 (5th Cir. 1993); *Stout v. Borg–Warner Corp.,* 933 F.2d 331 (5th Cir.), *cert. denied,* 502 U.S. 981, 112 S.Ct. 584, 116 L.Ed.2d 609 (1991); *Smith v. Xerox Corp.,* 866 F.2d 135 (5th Cir.1989).

▮ Under either the *Tate* or *Russek* standards, the Court finds that Houghtaling's failure to warn claim is preempted by the government contractor defense. Unisys presents evidence showing that the Postal Service specifications required safety devices as provided elsewhere in the specifications or in the drawings, Def.'s Ex. 10, ¶ 3.11.7.12. Unisys could not add warnings, markings, or labels to the MPLSM without the approval of the Postal Service. Lieske Aff., ¶ 9. Furthermore, Unisys' evidence that the Postal Service subjected each MPLSM to inspection and approval, as discussed above, establishes that Unisys provided warnings in conformance with specifications. Finally, the Court has already decided that Unisys did not know of any dangers in the use of the MPLSM keyboard that were not already known to the Postal Service. Because Houghtaling presents no evidence which contradicts the evidence that Unisys sets forth, the Court finds that, under the Tate standard, the government contractor defense preempts the failure to warn claim.

Furthermore, having already determined that Houghtaling's design defect claim is preempted by the government contractor defense, the Court must necessarily conclude that the failure to warn claim is also preempted under the *Russek* standard. Because the Court finds that Unisys has estab-

lished that under either the *Tate* or *Russek* standards the government contractor defense preempts Houghtaling's failure to warn claim, it will grant Unisys' motion for summary judgment with respect to the failure to warn claim.